DELAWARE, L. & W. R. CO. v. CITY OF SYRACUSE et al.

(Circuit Court, N. D. New York. December 7, 1907.)

1. DEDICATION—ACCEPTANCE—USER.

Where an offer to dedicate land as a street was made by the owner by laying out and selling lots fronting thereon as a street, its boundaries were defined by fences, walks and a roadway were made thereon and used by the occupants of the lots and by such of the general public as had occasion, and the village in which it was located caused it to be marked as a street on the map and to some extent improved it, such acts constituted an acceptance of the dedication by the public and the village, although no formal acceptance was ever made, and one claiming an abandonment by nonuser has the burden of proof to establish such claim.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Dedication, §§ 73–76.]

2. MUNICIPAL CORPORATIONS—STREETS—ABANDONMENT BY NONUSER.

Under section 144 of the New York statute (Laws 1898, p. 393, c. 182) governing cities of the second class, which provides that "every street that shall not have been traveled or used as a street for six years * * * shall cease to be a street," where a street was recognized as such by the city by making repairs thereon within the six years, and was traveled and used by persons living near by and by others, although such travel was light and occasional, it did not cease to be a street.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 1429.]

3. RAILROADS—RIGHT TO BUILD TRESTLE OVER STREET—CONSENT BY MUNICIPALITY.

Under the New York railroad law a railroad company is not authorized to build a trestle over a public highway in a city, to be occupied by tracks for the purpose of obtaining access to coal pockets, without the consent of the city, although it would not interfere with the use of the street; and in a city of the second class, where the power to regulate the use of streets by railroads is vested in the common council, such consent can only be

given by the council. Nor is the construction of such a trestle authorized by a resolution passed by the council granting permission to the company generally to construct and operate "switch or switches, track or tracks," across the street, but which makes no reference to a trestle.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, §§ 260–270.]

In Equity. Action to enjoin the defendants from interfering with the construction and operation by complainant of an elevated crossing at and over that part of Schuyler street known as "the extension of Schuyler street," if such extension be a street or part of a street, or, if it be not a street, then from interfering with the erection and operation of such elevated structure or tracks which leads into complainant's coal pockets on its own lands, and which tracks are used or to be used in taking cars loaded with coal to such pockets.

Alexander D. Jenney and Louis L. Waters, for complainant.
Walter W. Magee, for defendants.

RAY, District Judge. The material facts, as I find them to be, are as follows:

(1) The defendant city of Syracuse is one of the cities of the second class of the state of New York, and defendant Aaron R. Thompson is its commissioner of public works.

(2) The lands in question, where the complainant seeks to complete and operate its trestle, are situated in said city, but were in the village of Geddes prior to its incorporation into the said city.

(3) The complainant is a duly incorporated and organized railroad company, incorporated under the laws of the state of Pennsylvania, owning, leasing, and operating railroads both in the state of New York and elsewhere, and has a line running into and through the said city of Syracuse, with branches, depots, switches, side tracks, coal pockets, etc. It is largely engaged in interstate commerce and in the transportation and delivery of coal, and in said city receives and delivers large quantities annually.

(4) On the 28th day of December, 1903, the complainant, then engaged or about to engage in necessarily improving and extending its facilities in said city, more especially for the reception and delivery of coal in said city for general trade, supply, and consumption, applied to the common council of said city for permission and consent to cross Schuyler street in said city with a switch or switches, track or tracks, and on the same day such common council duly granted such consent and permission by duly adopting and entering the following ordinance:

"Be it ordained by the common council that the Delaware, Lackawanna & Western Railroad Company be and hereby is granted the right and consent to construct and operate a switch or switches, track or tracks, across the extension of Schuyler street between the blue line of the Erie Canal and the north curb line of West Fayette street."

December 30, 1903, this ordinance was duly approved by the mayor of the city.

(5) For convenience of expression I shall speak of the Erie Canal, the tracks of the New York Central & Hudson River Railroad, Dela-

ware, Lackawanna & Western Railroad, and West Fayette street, formerly Furnace street, as running easterly and westerly, and of Hamilton street, Schuyler street, and Ulster street as running northerly and southerly. Hamilton street and West Genesee street, which last-named street runs more to the east as we look northerly, intersect at or just south of the Erie Canal, where there is a bridge across the canal and an under street crossing of both the New York Central & Hudson River, and Delaware, Lackawanna & Western main tracks, which are north of and adjacent to the canal and from 12 to 20 feet above it on a high natural embankment. Hamilton, Schuyler, and Ulster streets are parallel. We may speak of these main railroad tracks, the canal, and West Fayette street as being parallel, although the street and canal diverge as we go easterly. Block 54 is the land bounded northerly by the canal, easterly by this so-called extension of Schuyler street, southerly by West Fayette street, and westerly by Hamilton and West Genesee streets, where they merge. Block 62 is the land bounded northerly by the canal, easterly by what would be Ulster street if extended north of West Fayette street, southerly by West Fayette street, and westerly by this so-called extension of Schuyler street. Southerly of West Fayette street, Schuyler and Ulster streets are well defined, laid out, and worked, as well as built upon. Ulster does not extend north of West Fayette. Long prior to the commencement of this action, and about 1903, the defendant company, then having and owning extensive tracks, coal yards, pockets, office, etc., east of the line of Ulster street extended northerly, and filling the entire space between West Fayette street and the Erie Canal up to and even west of Ulster street, bought up from the owners and took title in fee to all the lands in block 54, its lessor, the Syracuse & Binghamton Railroad Company, owning the lands in block 62, so that defendant and its lessor has title to all the lands bounded northerly by the Erie Canal, easterly by the line of Ulster street extended northerly, southerly by West Fayette street, and westerly by Hamilton and West Genesee streets; but, as it took no conveyance or release from the city, the rights of the city to a street or highway or to streets and highways in and upon said lands, if it had any such street or highway, were not conveyed, released, or extinguished by such conveyances.

(6) After becoming the owner of the lands in block 54, and after the granting of the permission of December 28, 1903, hereinbefore set out, the defendant commenced constructing and extending its tracks and switches westerly across the so-called extension of Schuyler street and between West Fayette street and the Erie Canal onto block 54, and operating its coal trains, construction trains, and engines thereon, and in so doing filled in and changed the grade of the land, including the so-called extension of Schuyler street, and removed all the buildings therefrom, as well as from block 62, excepting only that certain old and dilapidated structures on block 62, used for coal storage and delivery, remained. It also filled approaches to the trestlework hereafter mentioned on block 62, and constructed a trestle up to the easterly line of said so-called extension of Schuyler street; and on the westerly side of said extension, on block 54, it also erected and constructed an expensive and commodious office and office building, an ex-

pensive heating plant, and a commodious and expensive elevated coal pocket building for the discharge of coal from cars and the delivery thereof to dealers. It also erected trestlework from said building to the west line of said so-called extension of Schuyler street, which was to connect with the trestle on block 62. It also constructed and erected at considerable expense, in and on the 100-foot wide strip of land, extending from West Fayette street to the Erie Canal, called the extension of Schuyler street, two or more solid concrete piers to be used as supports for the trestlework to be erected on and across said strip or extension, and which was to connect and form a part of the trestle hereinbefore mentioned. All the bents and material for completing the said trestle, which was to be continuous from the tracks and switches on block 62 to and into the said coal pocket building, were constructed and on the ground ready for erection.

(7) All this had been done openly and without protest or objection from the city of Syracuse or any of its officials, and was done at an expense of from $30,000 to $50,000, or even more. The new buildings on block 54 are substantially useless and worthless without the completed trestle. They cannot be used profitably for any other purpose or in any other way.

(8) Having gone over and examined the ground and surroundings in company with the attorneys for the respective parties, some evidence being given on the subject in addition, I also find that the so-called extension of Schuyler street is and always will be useless and undesirable for street uses or purposes, unless the state shall continue the canal at its present location in the city and construct a pier or wharf at the foot of this extension for loading and unloading freight from canal boats, or the city should see fit to bridge the canal at the foot of a sharp descent with a swing bridge or its equivalent, and then construct an undergrade crossing north of the canal under the tracks of the New York Central & Hudson River Railroad and those of the Delaware, Lackawanna & Western Railroad, and condemn land for the further extension of Schuyler street northerly, all at an expense vastly in excess of any possible benefit. No part of such street, if made, could be built upon, as the canal and railroads own and occupy for track and transportation purposes all the land on both sides, except at what would be the extreme north end of the new street. The situation, surroundings, and evidence show such action to be unnecessary and improbable. There is no necessity for such an extension of Schuyler street, for, if made, it would merge into the main streets running into the central part of the city, and, if extended further, would end in a short distance in Onondaga Lake. In short, it was conceded on the trial, in substance, that the only possible purpose of insisting on the existence in the city of street rights in this so-called extension of Schuyler street, and maintaining the contention if possible, is to compel the complainant company at some future time to grant in exchange therefor street rights across its lands at some point further east, should same be desirable.

(9) All the acts of the complainant company and all its expenditures were necessary in its work as a public corporation and in serving the public, and were done and made in good faith. None of the acts done,

separately or collectively, in any way interfered with or could interfere with the use of this so-called extension of Schuyler street by the public. Early in 1904 it ceased to be used by any one as a street or as a right of way. No one lived thereon, or had occasion to use it as such, thereafter. It was a cul-de-sac ending at the canal, and connects with no street, avenue, or way except West Fayette. It was not and never has been a public thoroughfare. Again, the foundations or piers erected by defendant within this strip of land were so located and so far apart as to leave ample room for passage and travel, and did not form or constitute a nuisance or obstruction therein to public travel, or make travel therein dangerous. The distance from the surface of the ground to the bottom of the proposed trestle was greater than usual in such cases and ample for all purposes of public use or travel, and the trestle, if erected, could not have interfered with any proper travel on such so-called extension or legitimate use thereof as a public street. The elevation and width of the trestle opening was as great or greater than is usually required in Syracuse on much-used thoroughfares.

(10) On the 10th day of December, 1906, an ordinance was duly and regularly adopted by the common council of said city of Syracuse, calling for a report of the commissioner of public works of said city as to what streets had been lost under section 144 of the revised charter of cities of the second class (Laws N. Y. pp. 371–393, c. 182); and on the 17th day of December, 1907, said commissioner of public works reported to said common council in writing the streets in said city which, in his opinion, had been lost by reason of nonuser, and included in said certificate the name of Schuyler street between West Fayette street and the Erie Canal.

(11) On the 13th day of March, 1907, the said Delaware, Lackawanna & Western Railroad Company, with the consent of the mayor, duly obtained a written building permit from the fire marshal of the said city of Syracuse as required by law for the construction of a coal trestle 540 feet long in said blocks 54 and 62 in said city; and the contractor engaged in building same for complainant, or his representative, paid said fire marshal $50, which sum was paid in extinguishment of a penalty incurred for commencing the construction of such trestle without having obtained such permit.

(12) August 1, 1906, the mayor of the city of Syracuse served on H. H. Shepard, superintendent of the complainant road, a notice or letter stating:

"With reference to the construction of a coal pocket across Schuyler street in the Tenth Ward in the city of Syracuse by the Delaware, Lackawanna & Western Railroad Company, I hereby notify you that before your company can erect any part of any structure across Schuyler street above grade it will be necessary to secure permission by ordinance of the common council. You are hereby notified to do no work within the lines of Schuyler street toward the erection of the proposed coal pocket until the requisite permission is obtained from the common council, and such permission should be conditioned upon the company agreeing to remove such structure from within the lines of the street when requested so to do by the common council."

November 12th the complainant company petitioned the common council of said city as follows:

"To the Common Council of the City of Syracuse: The Delaware, Lackawanna & Western Railroad Company hereby petition your honorable body for permission to construct a trestle across Schuyler street to carry its railroad tracks thereon, commencing at **a point on the south side of Schuyler street** 85 feet east of the east curb of West Fayette street, thence north to a point on the north side of Schuyler street 90 feet east of the east curb of West Fayette street, and from a point on the north side of Schuyler street 75 feet east of the east line of West Fayette street to said point on the south side of Schuyler street. Your honorable body heretofore granted permission to your petitioner to lay tracks between West Fayette street and the Erie Canal. Said street ends at the Erie Canal, and all the lands on both sides thereof from West Fayette street to said canal are owned by your petitioner. Said street at the place in question is not used by the public.
  "Respectfully submitted,
            "The Delaware, Lackawanna & Western Railroad Company,
                            "By A. D. Jenney, Local Attorney.
  "Dated at Syracuse, N. Y., November 12, 1906."

This was accompanied by a proposed ordinance granting such permission and by a map of the locality and proposed work. As the matter was held up, or not acted on, about March 11, 1907, the complainant company, by its attorney, requested that such application be withdrawn from consideration and returned to the company. Such request was as follows:

"To the Common Council of the City of Syracuse: The undersigned hereby requests that its application presented to your honorable body asking for permission to construct a trestle across the extension of Schuyler street between West Fayette street and the Erie Canal, together with an ordinance therefor which was presented to your honorable body on November 19, 1906, and laid over, be withdrawn from consideration and returned to said Delaware, Lackawanna & Western Railroad Company.
            "Delaware, Lackawanna & Western Railroad Company,
                            "By A. D. Jenney, Local Attorney."

March 11, 1907, the common council passed and the mayor approved an ordinance as follows:

"Resolved, that the petition of the Delaware, Lackawanna & Western Railroad Company introduced November 12, 1906, together with the proposed ordinance introduced November 19, 1906, for the erection of a trestle across Schuyler street, extended from West Fayette street to the Erie Canal, be and the same hereby is withdrawn at its request and returned to said Delaware, Lackawanna & Western Railroad Company."

March 18, 1907, the attorney for the company wrote the mayor of the city as follows:

"Mayor Alan C. Fobes—Dear Sir: I have just returned from out of town, and find on my return that Supt. Shepard telephoned this morning that he had promised to let you know when work was started on the West Fayette street coal trestle at the extension of Schuyler street. I am also informed that work was started this morning. They started earlier than I expected they could, and I understand that Mr. Shepard had no notice of it. A trestle is under construction, but it will be replaced by a bridge as soon as the weather permits the building of concrete foundations. That which is building now is temporary only and preparatory to the bridge, being intended in the meantime as false work. City Engineer Allen, Assistant Beebe, and Commissioner Thompson, all of whom I saw last week and told of the preliminary work,

157 F.—45

advise me that if Schuyler street is ever extended to the canal the curb lines will be 30 feet apart and the sidewalk lines 15 feet further to each side. The company's bridge will not interfere with any such usage.

"Respectfully yours,                                    A. D. Jenney."

March 19, 1907, the commissioner of public works of said city served on the complainant company a notice as follows:

"Take notice that the trestle or work of construction now being done by you across Schuyler street in the city of Syracuse, N. Y., is unlawful and without permission of the common council, and you are further notified to immediately stop such work and replace the street in the same condition in which it was in; and in case of your neglect or failure to do it the same will be done by the undersigned, and the cost and expense thereof charged to and collected from you.

"A. R. Thompson, Commissioner of Public Works.

"To Syracuse, Binghamton & New York Railroad Company, Delaware, Lackawanna & Western Railroad Company, H. H. Shepard, Superintendent, and to Whom It may Concern."

The building permit had then been issued and was in force, and on that day, as complainant company was proceeding with the work of closing the gap in the trestle, its entire force of workmen at that point was arrested and locked up. March 20, 1907, the complainant company was notified to remove all abutments and bents, etc., from this so-called extension of Schuyler street within 24 hours. March 23, 1907, the deputy commissioner of public works forcibly removed the bents from said premises and took them apart, and on the night of that day blew up the concrete abutments or piers within the strip alleged to be Schuyler street extended from West Fayette street to the Erie Canal, and on the next day completed their destruction.

(13) On the 1st day of April, 1907, the common council of said city of Syracuse passed an ordinance in terms rescinding said ordinance of December 28, 1903, granting permission to complainant company to cross Schuyler street extended with switch or switches, etc., as follows:

"Be it ordained that the ordinance adopted by this common council on the 28th day of December, 1903, granting permission to the Delaware, Lackawanna & Western Railroad Company to construct and operate a switch or switches, track or tracks, across the extension of Schuyler street, in the city of Syracuse, be and the same hereby is rescinded."

This rescinding order was approved by the mayor of the city. Some 10 or 12 tracks and switches had then been completed and put into operation across the said extension under and pursuant to this authority granted by the original ordinance giving consent, and substantially all the other work mentioned had also been completed.

(14) This noisy, spectacular, and somewhat dramatic and dangerous blowing up of these concrete foundations was unnecessary to the protection of the rights of the city, even if of the broad nature claimed by the defendants here. I am inclined to think that objects or motives other than a mere desire to protect the rights of the city in this disputed territory as a street lay behind and prompted this action; but I do not attempt to pass on the evidence on that subject, as I deem the question irrelevant and immaterial.

(15) More than 30 years ago, whenever lots on these blocks which abutted on this so-called extension of Schuyler street were sold off, they were generally bounded by Schuyler street, or by Third South street, as it was formerly called. There was a house near the southwest corner of West Fayette and Schuyler street extended, fronting on West Fayette street, with a barn in the rear to which access was had from Schuyler extended, another further north on the same side fronting on Schuyler extended, and another of brick, in which a store was kept until 1881, on the same side next the canal; also a house on the west side of Schuyler street extended, at the corner of said street and West Fayette street, facing on the latter street. Forty or more years ago there was also a cooper shop between this house and the canal. Most of the land on the west side of Schuyler extended was usually open to the public. Those living in the two houses on the easterly side of Schuyler street extended, and fronting thereon, for years used this extension as a street or right of way, as they had a right, and all comers and goers to said places used it in the same way. So long as and when the land along the blue line of the canal was open, many persons at times passed down this extension and then cut across to Hamilton street, and sometimes came through from Hamilton and Genesee streets. Prior to the incorporation of the village of Geddes into the city of Syracuse as a part thereof, which occurred May 1, 1886, by special act of the Legislature, and which took final effect in February, 1887, the authorities of the said village accepted the implied dedication or offered dedication of such extension of Schuyler street as a street by the owners of the lands in so deeding them, by having it mapped or platted, with others, as a street of the village, and also by authorizing it to be worked and cared for as a street, not to the full extent streets in villages are usually worked and cared for, but sufficiently to show an intent and purpose to accept and treat same as a part or continuation of Schuyler street, or Third South street, to the Erie Canal, and as a part of one of its public streets and highways. There is no evidence that an ordinance of the village or a resolution of its trustees or other authorized officers was ever adopted, accepting it, or establishing it, or recognizing it as a street. However, it does appear that the records of said village, which probably would have shown such action, had it been had, were destroyed many years ago. I find that such extension did in fact become and was practically treated and cared for as one of the streets of the village of Geddes, and was such when that village became a part of the city of Syracuse in February, 1887.

(16) I find no definite or satisfactory evidence that the city of Syracuse ever affirmatively recognized or treated this so-called extension of Schuyler street as one of its streets, or as a part of one of its streets. It was not paved or curbed or worked, or kept open and in condition for public travel by the city. But until the defendant company bought up the lands on this extension and took possession and removed the buildings, those who lived there used same as a street, and all of the general public having occasion to go to the canal at the foot of the extension, or to the store mentioned, or to the house south thereof, and located between the canal and West Fayette street, traveled thereon at

will. In short, by those who had occasion to use it as a public street for travel and convenience, it was so used down to early in 1904. The city of Syracuse took no action in regard to it the one way or the other, except that at one time its authorities voted to pave same. This action was taken so it could be said it had done some act showing an intention not to abandon it, and not with any purpose or intent to actually pave, work, or care for the street. At one time, about 1890 or 1891, the city authorities used a portion of this extension of Schuyler street for the purpose of temporarily storing unbroken stone, and which was to be broken at the place mentioned and then removed, and which, when broken, was removed to other streets of the city and there used for repairing streets and avenues. In so doing the city did not wholly obstruct and close Schuyler street extended, but left a sufficient open space for teams and pedestrians to pass. The city of Syracuse never either constructed or repaired, or caused to be constructed or repaired, any sidewalk or portion of a sidewalk upon either side of this extension. There was a cinder side path on the westerly side for some distance at least, and a short piece of stone walk and considerable plank walk on the easterly side; but these were constructed and maintained by the owners or occupants for their own convenience. On one occasion the city authorities filled some mudholes in this extension of Schuyler street, and on another occasion caused or suffered its employés to clean out the gutter or ditch on the westerly side.

Section 144 of the charter of cities of the second class (Laws 1898, p. 393, c. 182) provides as follows:

"Every street that shall not have been traveled or used as a street for six years, and every street that shall not have been opened and worked within six years from the time it shall have been dedicated to the use of the public or laid out, shall cease to be a street; but the period during which any action or proceeding shall have been or shall be pending in regard to any such street shall form no part of such six years."

Section 145 provides:

"All lands which shall have been used by the public as a street for 20 years or more shall be a street with the same force and effect as if it had been duly laid out and recorded as such."

Under the facts as I have found them to be, and as I must find them to be, can it be said that this so-called extension of Schuyler street from West Fayette street to the Erie Canal was not opened and worked within six years from the time it was dedicated to the use of the public? Or under the facts as I have found them to be, and must find them to be, can it be said that this extension of Schuyler street was not traveled or used as a street for the six years preceding the time when defendants entered thereon and removed the obstructions placed therein? The deeding of the lots abutting on this extension of Schuyler street as bounded thereby constituted in law a proposed dedication of the land embraced within the lines spoken of as a street to the public. It was optional with the public to enter and use or not, and it was optional with the public authorities to accept the proposed or offered dedication or to reject. As between the owners of such lots so described, such mentioned street became a right of way which they

could keep open and unobstructed. These private rights last mentioned were extinguished when the respective owners deeded to the Delaware, Lackawanna & Western Railroad Company. But such conveyances could not affect and did not affect the rights of the public or the rights of the City of Syracuse to insist that this was a street. From the evidence it is clear that for at least 80 years the general public, so far as it had occasion, used this extension as a street. It was not necessary that all the people of Geddes or of Onondaga county should use same as a street. Considerable numbers residing on the street, so called, and in that vicinity, having occasion to use it, did use it, and the right was not denied or questioned. The public authorities of Geddes, recognizing this condition, kept it open and in reasonable condition for use.

As matter of fact and within the meaning of the law this extension of Schuyler street was opened and worked within six years from the time of the proposed dedication. Within six years from that time it was actually laid out and its boundaries defined by fences and walks running from West Fayette (formerly Furnace) street northerly (or, as some would say, easterly) to the Erie Canal. Thereafter, and down to 1886 or 1887, it was worked occasionally by the authorities of the village of Geddes, and thereafter, and on two occasions at least, to a very slight extent true, by the authorities of the city of Syracuse. It cannot be said that this extension of Schuyler street was not opened and worked within six years from the time it was dedicated to the use of the public or laid out. It cannot be said or held that this extension of Schuyler street had not been traveled or used as a street for the six years preceding the 20th day of March, 1907, or August 1, 1906, when the city plainly asserted its rights in the street. Up to the spring of 1904 persons lived upon this street and came from and went to their homes, as did all their friends and neighbors and persons having business with them. Within the six years preceding that date material of various descriptions had been unloaded from the canal at or in the vicinity of the foot of this Schuyler street extension, and this material or some part of it had been drawn out through Schuyler street extended to West Fayette street. Permission to do this was not sought or granted by any one. For the six years preceding the date mentioned the use of this street as a street and the travel thereon had not been extensive, and it was growing less and less as the years went by. Still the use of this extension as a street and travel thereon by the public had not wholly ceased. For this reason it cannot be held that this extension of Schuyler street had ceased to be a street when the complainant company took title to all the lands embraced therein and situated on the westerly side thereof; the Syracuse & Binghamton Railroad Company having become the owner of all the lands on the easterly side thereof. For the same reason it had not ceased to be a street in March, 1907. To constitute travel and use within the meaning of section 144 of the charter of cities of the second class, there must have been substantial travel or substantial use thereof as a street; but what constitutes substantial use depends largely upon the location of the street in question and largely on the surroundings and necessities of the case.

In Elliott, Roads and Streets (2d Ed.) § 192, it is said:

"Roads and streets used by the public, with the right in all the public to use them, are undoubtedly public, and private property may be appropriated for the purpose of constructing such ways. The test is, not simply how many persons do actually use them, but how many have a free and unrestricted right in common to use them; for if the public generally are excluded the way must be regarded as a private one, and if the public have the right to use the way at pleasure and on equal terms it is a public one, although in reality it is little used."

The doctrine of the text is supported by many authorities.

It appearing clearly in this case that there was a proposed or offered dedication of this extension of Schuyler street as a public highway; as houses were constructed thereon and its limits were defined by fences, walks, and a driveway; as this was followed by a platting and marking of the street upon a map of the village of Geddes adopted by its authorities, by an actual working of the street as such by the authorities of the village, and by an actual use of it as a street for travel, not only by the persons living thereon, but by all who had occasion to do business there—an acceptance of the dedication by the authorities of the village clearly appears, and that this became a public street is clearly established. This being so, the burden of showing that this extension of Schuyler street was abandoned, or that it ceased to be a street, because not traveled upon or used as a street for six years, rested upon the complainant company. Elliott, Roads and Streets (2d Ed.) p. 956, § 872; Horey v. Haverstraw, 124 N. Y. 273, 26 N. E. 532.

It is contended by counsel for the complainant company that, inasmuch as the travel upon this extension from the spring of 1888 to the spring of 1904 was very light and occasional only, aside from the two families living thereon, it cannot be said there was public travel thereon. It is further contended that such travel did not constitute user, and that to maintain it as a street in the face of the statute quoted it must appear that during the six years mentioned there was not only public travel upon this extension, but acts on the part of the city of Syracuse showing that it recognized and treated it as a street, and that the evidence fails to show any such acts on the part of the authorities of the city. I have referred to two acts on the part of the city tending to recognize this extension as a street. One was the filling up of some mudholes with ashes, and the other was the digging out of the gutter on the westerly side. The witnesses placed these acts within the six-year limit. Both acts were in the nature of repairs to the street, and both acts were done to maintain the street in a fit condition for public travel. I cannot discredit this testimony. Having in mind what was said by the court in Spier v. Town of New Utrecht, 121 N. Y. 420, 24 N. E. 692, in People v. Underhill, 144 N. Y. 324, 39 N. E. 333, in City of Buffalo v. D., L. & W. R. R. Co., 68 App. Div. 505, 506, 74 N. Y. Supp. 355, 356, affirmed 178 N. Y. 561, 70 N. E. 1097, and in Horey v. Village of Haverstraw, 124 N. Y. 273, 277, 26 N. E. 532, I am of the opinion it must be held that this extension of Schuyler street had not ceased to be a street at the time the city authorities entered thereon and did the acts complained of in March, 1907.

We come to another question, viz.: (a) Was it necessary that express authority be given by the common council of the city of Syracuse, in order to confer on the complainant company the right to cross this extension of Schuyler street, or Schuyler street extended, with its tracks and switches? and (b) this consent having been given in general terms, did it include the right to cross such extension above grade with a trestle properly constructed so as not to impede or interfere with public travel or the rights of the public? Did the consent given by the ordinance of December 28, 1903, approved December 30, 1903, confer the right to cross at grade and also above grade with trestles or bridges, appropriate structures, which would not impair the usefulness of the street as such? We might state the question in a variety of forms, but the practical one is: Did the Delaware, Lackawanna & Western Railroad Company need, and had it obtained, the consent of the city by its common council to do what it was engaged in doing at the time in question in erecting trestlework over this extension of Schuyler street itself, including the retention and use of the supports therefor, the concrete piers standing within the street line, and which had been put in without protest or objection and completed on or before July 15, 1906?

While conceding that complainant company was not authorized to extend its tracks across the public streets or avenues of the city of Syracuse at will and without its consent, either at or above grade, that company insists that it had, as to the place or street in question, the necessary consent, which is evidenced in several ways:

(1) By the ordinance of December 28, 1903, approved December 30, 1903, which grants a general unrestricted right to construct and operate "a switch or switches, track or tracks, across the extension of Schuyler street," etc.

(2) By the construction and operation of the several tracks across said street at grade to and upon block 54 without objection.

(3) By the construction and erection of the trestle and its approaches so far as completed, and the erection of the pocket, office, etc., on block 54, and of the piers or concrete foundations for the trestle within the lines of Schuyler extended, prior to July 15, 1906, all without any objection or protest from the city or its authorities.

(4) By the issue and grant of the permission to erect this trestle work, and which was issued by the fire marshal of the city with the consent and approval of the mayor on the 13th day of March, 1907, and which was accompanied by the payment of a fine of $50 for having commenced such construction without the permit, and which was issued with knowledge that the complainant company had then withdrawn its application with the common council to cross this extension with the trestle. The application for this permit was accompanied by a map showing the trestle to be continuous, and to extend over or across this extension of Schuyler street.

(5) By the consent of the commissioner of public works of the city, who stated in March 16, 1907, to the attorney of complainant company:

"Go ahead with your work. You have got your building permit, and you have got nothing to worry about as far as my department is concerned. I won't stop you."

(6) By the consent of the alderman of the ward where this trestle is located, who said to complainant's attorney March 4, 1907:

"I have told you repeatedly that if you get your building permit you are perfectly safe without any resolution, as the ordinance of 1903 is enough to satisfy me as alderman of the ward, and if you get your building permit as far as I am concerned you can go ahead."

(7) By the attitude of the city in December, 1906, that this extension of Schuyler street had ceased to be a street by reason of nonuser.

(8) By the fact that no objection to crossing this Schuyler street extended with the trestle above grade was raised by any one until the objection of Father Magee, who was not an official of the city, was made to the mayor.

By section 4 of the railroad laws of the state (Laws 1890, p. 1083, c. 565) it is provided that:

"Subject to the limitations and requirements of this chapter, every railroad corporation in addition to the powers given by the general stock corporation laws, shall have power * * * to construct its road across * * * any highway which the route of its road shall intersect or touch."

By section 11 of the railroad law (Laws 1890, p. 1087, c. 565) it is provided in substance that as a prerequisite to the exercise of this power the assent of the corporation of said city shall be obtained, and as a condition subsequent it is provided that the highway across shall be restored to its former state or to such a state as not unnecessarily to impair its usefulness, and further provides:

"And such highway may be carried by it [the railroad company] under or over its track as may be found most expedient."

I do not think that this last provision as to carrying the highway under or over the track can be held to authorize a railroad company to build a trestle over a public highway in a city or village for the purpose of obtaining access to its coal pockets without the consent of the city authorities. Having made the consent of the city a prerequisite to the crossing of a street at all, the Legislature further provided by subdivision 4 of section 22 of the revised charter of the city of Syracuse (Laws 1885, p. 35, c. 26), continued in force by section 483 (page 443) of the charter of cities of the second class:

"That the common council shall have power * * * to regulate the use of streets * * * by * * * railways."

In substance and effect it was necessary for the complainant company to obtain the consent of the common council of the city of Syracuse to its crossing this extension of Schuyler street. This fact was recognized by the complainant company, and in 1903 it obtained a consent accordingly. This power to give consent is vested in the common council alone, subject only to approval or disapproval by the mayor. No other officer or body of officers in the city had power to assent to this crossing or to vary the scope of the consent given by the common council. Neither the mayor, nor the fire marshal, nor the alderman of the ward, nor the commissioner of public works could take the place of the common council, or broaden or limit the scope of the ordinance passed by that body, except as the mayor might ap-

prove or disapprove in the first instance. I think we return necessarily to the scope and effect of the ordinance of December 28, 1903. The granting of the permit by the fire marshal to erect the trestle, approved by the mayor, was not a consent of the common council that such trestle might be erected and put in operation. It was not a consent by the common council that the complainant company might cross Schuyler street extended with a trestle of that description. The common council had nothing whatever to do with the issuance of this permit. Neither the mayor nor the fire marshal, nor both together, had power to waive the requirement of the charter that a street of the city of Syracuse should not be crossed by a railroad company without the consent of the common council. It well might be that, the common council having assented to the crossing of Schuyler street extended by means of a trestle or other structure, still the assent of the fire marshal to the erection of such structure was necessary before it could be erected. The practical construction put upon the consent of December 28, 1903, was that it authorized a crossing of that street at grade, and some 10 or 12 tracks and switches were constructed accordingly. These have not been interfered with, and cannot be. They were constructed by the complainant company in good faith, with the ordinance in full force and effect. The rights gained cannot be taken away. There can be no successful contention that these tracks and switches are not the precise structures assented to and authorized by law. There can be no successful contention that these structures constitute either a nuisance or obstructions in a public street. The subsequent action of the common council, approved by the mayor, in repealing or rescinding this ordinance, did not change the status of the parties or affect their rights in the slightest degree.

We come, then, to the remaining question: Did the ordinance of December 28, 1903, approved December 30, 1903, granting to the complainant company "the right and consent to construct and operate a switch or switches, track or tracks across the extension of Schuyler street," confer the right on that company to construct and operate a track or tracks across the extension of Schuyler street above grade? that is, to construct tracks across the extension of Schuyler street, supported by a trestle resting upon and supported by piers or foundations situate entirely outside the street lines, or located mainly outside and to some extent inside the lines of the street, provided such trestlework should be so elevated as not to interfere with the use of the street as a street, and provided, further, that the supports, if any, within the street lines, should be so located as not to interfere with the use of the street as such, or with public travel thereon. Broadly speaking, was the consent of December 28, 1903, a consent to cross such street both at grade and above grade, or either at grade or above grade, as the company should elect? The position of the city of Syracuse is, first, that the consent given included the right to construct tracks and switches across the extension of Schuyler street at grade only; second, that if it conferred a right to cross with tracks and switches either at grade or above grade, as the railroad company might elect, the complainant company has exercised its election and exhausted its

power; lastly, that the consent given in no event was a consent to cross Schuyler street extended both at grade and above grade.

My attention is called to a case in the Court of Appeals in the state of New York, Delaware, Lackawanna & Western Railroad Company v. City of Buffalo and Henry Quinn, 158 N. Y. 266, 53 N. E. 44, and also on motion for reargument in 158 N. Y., at page 478, 53 N. E., at page 533. In that case it appears that consent was given by the proper municipal authority of the city of Buffalo to the railroad company to cross certain streets of the city including Main street; the crossing of that street to be by bridge, leaving a clear roadway underneath at least 12 feet in height and 28 feet in clear, subject to the approval of the city engineer. The railroad company, without obtaining an approval or submitting any plan, was proceeding with its work when the common council passed a resolution directing the company to put in a span of at least 60 feet at the crossing. Of this action the railroad company had due notice. This action was had upon the advice of the city engineer. Later the common council passed another resolution, in which it was resolved in substance that no consent should be given to the crossing of Main street by the company until its agents should pledge themselves to cross Main street with a bridge having a span of the full width of the street. Taken together, this was the only consent ever given to the construction of the bridge in question. It was found, however, that while the company was proceeding with the construction of the crossing at Main street there was a conference between the city engineer, the street committee of the common council, and various officers of the railroad company, at which conference it was agreed that the company should modify its plans for the elevated crossing and construct it as it was afterwards actually constructed, and that all this was done with the approval of the city engineer. All this occurred in 1881 and 1882. In 1890 the common council of the city of Buffalo passed a resolution directing the street commissioner to notify the railroad company to remove the abutments located within the street lines within 90 days, and if not done within that time that the commissioner would remove the same and charge the expense to the company. The company was notified of this action, and was told that if it did not remove the abutments the city authorities would forcibly remove them. Thereupon the railroad company brought action in equity to enjoin the threatened action. It will be noted, first, that the common council as such never consented to the erection of this elevated crossing as it actually was constructed; second, that it did have notice and knowledge of what was being done and of what was done, and that what was done met the approval of the city engineer; third, that the elevated crossing as constructed remained undisturbed and unobjected to for some seven or eight years. It was further found as a fact that this elevated crossing, with its supports and abutments in the street, seriously interfered with public travel; "that the pier, abutment, and earth embankment in the street are obstructions to public travel that materially delay and inconvenience the public in the use of the street; that the plaintiff in erecting the structure did not restore the street intersected by it to its former state, or to such state as not to have unnecessarily impaired its usefulness;

and that the street has been and is impaired by the existence therein of the pier, abutment, and embankment of earth." Thereupon the complaint was dismissed.

In affirming the judgment of the lower courts dismissing the complaint the Court of Appeals in substance held (1) that the common council never consented to the structure actually erected; (2) that the structure as it existed was from the beginning an obstruction to public travel, and an unwarranted and unnecessary appropriation of a large part of the public street to the use of the railroad company, and that even the common council had no power to authorize such an obstruction, as it was evident that the railroad company could have exercised its legislative right to cross without obstructing the street to the extent it was obstructed; and (3) that if there was any consent given, acting with the legislative authority given direct by statute, to authorize the crossing, there was no consent to do the precise thing that was in fact done. On the reargument the court held (158 N. Y. 479, 53 N. E. 533):

"Independently of the limitations upon the power of municipal authorities to permit obstructions to be placed in streets by railroads, a railroad cannot maintain a structure, elevated or otherwise, across a street, as against the municipality, in the absence of clear proof of consent on the part of the municipal authorities to the construction of the identical structure in question."

Compelled, as I am, to hold that Schuyler street extended became one of the public streets of the city of Syracuse when the village of Geddes was incorporated into that city as a part thereof; that such street was traveled and used by the public to some extent down to the spring of 1904; that it was repaired by the public authorities of said city, charged with that duty, at least twice within the six years prior to the spring of 1907; that consequently it has not been abandoned and has not ceased to be one of the streets of the city of Syracuse; that the city of Syracuse, by its duly authorized officers, to wit, its common council, has not consented to the erection of the identical structure in question, viz., an overhead or elevated trestle to carry railroad tracks upon and over Schuyler street extended with supports or piers in such street, and which was the only structure interfered with by the city or which it has threatened to interfere with—it follows, I think, that this action cannot be maintained. The will of the court, or its ideas of what would be proper under all the conditions and circumstances, cannot be substituted for the consent of the proper city authorities, its common council. The right to cross this street with such a structure, assuming it would not unduly obstruct the street, depends on legislative consent. The power to give that consent has been devolved upon, or delegated and committed to, the municipal authorities of the city, and not to the courts. That consent, that authority, has not been given. It matters not that the officers of complainant company thought it had been given; that they acted accordingly and in good faith; that large sums of money have accordingly been expended by the company in buildings and approaches to the street, which expenditures will be substantially a waste if the trestle is not completed and operated; that the equities all favor the complainant company;

and that the court is satisfied, and finds, that the completed structure would not in any way obstruct or impair the usefulness of the street as such, or impede or interfere with public travel thereon. The facts remain that this is a public street, and that consent to cross it in the mode and manner and by the means proposed and used and sought to be used has not been given, and that the court is powerless to make a decree which, in effect, would authorize and permit such a crossing by such means and such a structure in the absence of such consent. That it has power to prevent any interference with the tracks and switches already laid across this street goes without saying. While the common council of the city repealed or rescinded the ordinance of December 28, 1903, approved December 30, 1903, I find no evidence that this was done as preliminary to a disturbance of or interference with these tracks, but rather as a bar or answer to any claim that an ordinance is in force permitting or authorizing the completion of the trestle over and upon Schuyler street extended. The position seems to be that the city has the right to rescind or withdraw a consent to a particular mode of crossing at any time before it has been acted upon by the actual construction of the thing authorized. How that may be I do not find it necessary to decide. I find no evidence of a demand that these tracks or switches be removed, or of a threat to remove or interfere with them.

There will be a decree dismissing the bill of complaint, but, under all the circumstances, without costs.